UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
COMPREHENSIVE MANUFACTURING
ASSOCIATES,

        Plaintiff,

v.                                                                    3:15-cv-835

SUPPLYCORE, INC.,

        Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
THOMAS J. McAVOY
Senior United States Judge

## DECISION and ORDER

Before the Court are Defendant's motion and renewed motion to dissolve the temporary restraining order and stay the case pending arbitration, or in the alternative to dismiss or transfer venue. See dkt. #s 14, 24. The parties have briefed the issues and the Court has determined to resolve the matter without oral argument.

**I.    BACKGROUND**

This matter concerns a contract dispute between two manufacturers. Plaintiff claims that Defendant breached a contract calling for Plaintiff to supply fabricated parts to the Defendant, an assembler. Defendant denies Plaintiff's allegations and contends that the parties agreed to submit any contract disputes to arbitration.

Plaintiff Comprehensive Manufacturing Associates, LLC ("CMA"), is in the business of selling fabricated parts and assemblies to customers. Amended Complaint ("Amend. Complt."), dkt. # 16, at ¶ 9. Defendant SupplyCore, Inc. ("SupplyCore"), one of Plaintiff's customers, serves as "'one of the leading integrated logistics, supply chain

management, and web-based procurement services' for the Armed Forces[.]" Id. at ¶ 8.

At issue in this case is a dispute between the parties over 2014 orders to manufacture military parts. Plaintiff alleges the parties formed a contract in late 2014 which obligated SupplyCore to abide by the contract terms supplied by CMA. SupplyCore contends that CMA agreed to the contract terms Defendant proposed. Only SupplyCore's proposal contained an agreement to arbitrate. Thus, if the terms supplied by the Defendant control, the Court will be required to stay the case pending arbitration. If CMA's terms control, no arbitration agreement exists and this case may go forward.

Plaintiff filed a Complaint on May 21, 2015 in the Supreme Court of New York for the County of Broome. See Notice of Removal, dkt. # 1. That same day, SupplyCore filed a demand for arbitration against CMA with the American Arbitration Association. Id. at ¶ 6. On or about June 8, 2015, CMA filed an action in the Broome County Court seeking to stay the arbitration proceeding through a temporary restraining order. Id. at ¶ 7. Defendant removed the case to this Court on July 8, 2015. Id. Defendant then filed a motion "for an order dissolving the *ex parte* temporary restraining order issued by the New York Supreme Court, and staying this action for arbitration, or, in the alternative, dismissing this case or transferring venue of this action to the U.S. District Court for the Northern District of Illinois, based on mandatory arbitration and venue provisions." See dkt. # 14. Plaintiff filed an Amended Complaint on August 26, 2015. See dkt. # 16. The Amended Complaint seeks $129,315.42 in damages from the cancelled contracts, as well as interest, attorney's fees, witness fees and court costs. Contending that the Amended Complaint did not cure the deficiencies in the original

2

Complaint, the Defendant renewed its motion to dissolve the temporary restraining order and stay pending arbitration, or in the alternative to dismiss and transfer venue. See dkt. # 24.

## II. LEGAL STANDARD

At issue here is whether the parties agreed to arbitrate their dispute. Defendant has moved for an order staying the action in this Court to permit Defendant to move for an order compelling arbitration in the Northern District of New York pursuant to Section three of the Federal Arbitration Act ("FAA"). "Congress enacted the Federal Arbitration Act ("FAA") 'to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts.'" Accenture LLP v. Spreng, 647 F.3d 72, 74 (2d Cir. 2011) (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24 (1991)). The Act "manifest[s] a liberal federal policy favoring arbitration agreements." Id. (internal quotations and citations omitted). Section 3 of the FAA provides that "[i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved . . . is referable to arbitration under such agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3.

Defendant argues that a distinct legal standard applies to determine whether an agreement to arbitrate exists under Section three of the FAA. Defendant does not explain what that standard is. Defendant simply points out that, if the Court determines

3

that the parties agreed to arbitrate their dispute, the Court would be compelled to grant Defendant's motion and stay this action while that arbitration occurred. The Court agrees. The Second Circuit Court of Appeals has recently concluded that "the text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested." Katz v. Cellco P'Ship, 794 F.3d 341, 347 (2d Cir. 2015). Section three of the FAA, however, does not recite the standard by which the Court should determine whether an agreement to arbitrate exists.

Federal law is clear about how courts are to go about determining whether an agreement to arbitrate exists: "[c]ourts are mindful that 'arbitration is a matter of contract.'" Shaw Group v. Triplefine Intern. Corp., 322 F.3d 115, 120 (2d Cir. 2003) (quoting AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986)). Arbitration applies only to "issues" the parties "specifically agreed to submit to arbitration." Id. "Whether parties have obligated themselves to arbitrate certain issues, including the question of arbitrability, is determined by state law." Id. Defendant does not dispute this principle. Defendant looks to the agreement between the parties and the principles of contract law in New York to determine whether the parties had an agreement to arbitrate the dispute that arose regarding their contract. The Court will do the same.

**III. ANALYSIS**.

Defendants seek to have the Court stay the action to permit arbitration, as well as alternate relief. The Court will address the issues as appropriate.

4

A. **Arbitration**

i. **Factual Background**

The documents provided by the parties sketch out a course of dealings between the parties in reference to the putative contracts in question.

Terry Dreamer, CMA's President, filed a Declaration in response to Defendant's first motion that described the course of dealings between the party. See Dreamer Declaration, dkt. # 20. Dreamer relates that SupplyCore "solicited CMA to provide manufactured parts" in early 2009. Id. at ¶ 6. As part of CMA's "contracting process, and because CMA may be required to borrow money and finance the manufacture and sourcing of products sold to customers like SupplyCore," CMA required SupplyCore to "fill out a credit application and agree in writing to CMA's terms and conditions of sale." Id. SupplyCore supplied such a credit application on May 14, 2009. Id. at ¶ 8. SupplyCore therein expressly agreed to accept CMA's Terms of Sale. Those conditions did not contain the arbitration provision here in question. Id. at ¶ 9.

In relevant part, CMA's Terms & Conditions of Sale provide that "[t]he acceptance and/or acknowledgment of any order by Comprehensive Manufacturing Associations, LLC, . . . or any performance by CMA pursuant to any order shall constitute this purchaser's acceptance of CMA's terms and conditions and the prices set forth by CMA[.]" See Exh. B to Dreamer Declaration, dkt. # 20. "[A]ny order is expressly conditioned upon the applicability of CMA's terms and conditions exclusively. No terms or conditions stated by purchaser shall be binding on CMA." Id. Moreover, any failing by CMA to object specifically "to any or all terms and conditions suggested

by the purchaser shall not be deemed an acceptance of any such terms and conditions which are in conflict with, inconsistent with or in addition to the terms and conditions set forth herein[.]" Id. The Terms & Conditions also established Broome County, New York as "the proper venue for any actions arising out of or because the breach of any agreement entered into with CMA." Id. The agreement does not contain an arbitration provision. Id.

Dreamer avers that CMA and SupplyCore had executed as many as 37 contracts from 2009 to 2014. Dreamer Declaration at ¶ 11. In most cases, the contracting process "normally commenced with SupplyCore soliciting a quote from CMA to provide certain manufactured parts." Id. at ¶ 12. CMA responded to such solicitations with "a written offer that quoted details as to price per unit, quanitity, delivery, shipping and advising that CMA's Terms of Sale would apply." Id. at ¶ 13. SupplyCore would respond "by issuing its purchase order." Id. at ¶ 14. The purchase order "confirmed the price per unit, quantity, delivery and shipping details set forth in CMA's quoted offer." Id. The purchase order also "reference[d] [SupplyCore's] own terms and conditions," which were different from CMA's terms. Id. CMA acknowledged SupplyCore's purchase order in writing. That acknowledgment "indicated that the order would be subject to the listed terms referenced in the acknowledgment, including CMA's Terms of Sale." Id. at ¶ 15. According to Dreamer, "SupplyCore never once rejected CMA's Terms of Sale or required that CMA agree to the terms and conditions referenced on SupplyCore's purchase order(s)." Id. at ¶ 16.

Plaintiff provides a series of e-mails between Dreamer and SupplyCore officials regarding the orders in question. See Exh. C to Dreamer Declaration. On April 25,

6

2014, Dreamer e-mailed a quote to Brad Howard, Buyer Analyst at SupplyCore. Id. The e-mail stated that "We are pleased to quote" and then offered prices from 300 pieces, 500 pieces, 750 pieces and 1,200 pieces. Id. The quote promised "240 Days ARO." The document listed terms: "Net 30 Days with prior credit approval. FOB Endicott, N.Y., . . . Quote valid for 60 days unless extended in writing. CMA Standard CofC included with all shipments . . . Subject to CMA Standard Terms of Sale." On July 9, Jarrod Norman, SupplyCore's Program Manager, Aftermarket/NSN responded. Id. Howard was out of town. Id. Norman wanted to know if CMA could deliver quantities of less than 300, and if CMA had "any room to lower" its "costs." Id. Norman also wanted to know whether the parts could be delivered any faster, and in stages. Id. Dreamer responded on July 15, 2014, stated that CMA could lower its minimum order to 250 pieces, and could deliver "165 pcs in 170 days and balance of 165 by 240 days." Id. On August 15, 2014, Brad Howard wrote to Dreamer, letting him know that the Defense Logistics Agency "want[ed] to change to pricing tiers to 300, 500, 700, 900+," which were different from those quoted originally by CMA. Id. Howard wanted to know if Dreamer could "hold the 750 pc price for 700? What would your price be at 900?" Id. He also wanted to know "the total lead time" on "a single order of 1,115 pcs." Id. Dreamer responded on August 18, 2014, stating that the "750pc price for 700pcs is OK." Id. He also offered a price for 900 pieces and stated the lead time for 1,115pcs would be 240 days. Id.

  Plaintiff contends that Defendant requested that the quote be extended. On November 3, 2014, Dreamer sent Johnson an e-mail asking, "I am not sure what you mean about expiration date. Can you please explain?" See Exh. C to Dreamer

Declaration of October 5, 2015, dkt. # 27.  Johnson responding by describing the inquiry as "just how long this pricing will be good for–we have to enter a validity period/expiration date in the paperwork."  Id.  Dreamer responded that "[a]s we discussed, current pricing is valid until 3/31/15."  Id.

SupplyCore sent a series of four purchase orders beginning on November 3, 2014.  See Exh. C to Dreamer Declaration.  The first order, dated November 3, 2014, was for 64 sprocket wheels at a price of $279.20 per unit and an additional 236 sprocket wheels at the same price.  Id.  The total value of the order was $83,760.  Id.  The order form states that "Orders are subject to SupplyCore's MRO Terms and Conditions of Purchase dated September 2010 and SupplyCore's MRD Flowdown Clauses dated January 2009 or mutually agreed upon terms."  Id. The second purchase order is dated November 6, 2014 and requests 947 sprocket wheels at a cost of $210 per unit.  Id.  The total cost on the order amounted to $198,870.  Id.  The form contains the same statement regarding the conditions of purchase.  Id.  The third order, which contains the same conditions as the previous two orders, seeks 261 sprocket wheels at a price of $279.20 per unit.  Id.  The total value of the order was $78,871.20.  Id.  The order, like the fourth order, is dated November 13, 2014.  Id.  That fourth order sought additional sprocket wheels and had a total value of $104,420.80.  Id.  The order contains the same conditions as the previous three.  Id.

In relevant part, the terms and conditions of purchase stated by SupplyCore provide that "[t]hese Purchase Order terms and conditions constitute the exclusive terms and conditions between the parties for items ordered by SupplyCore."  Exh. B to Affidavit of Brandon Lepke, dkt. # 14-3, at ¶ 2.  "Acceptance of the Purchase Order

constitutes Seller's unqualified assent to these Terms and Conditions of Purchase." Id. The Terms and Conditions further provided that "unqualified acceptance" of the Purchase Order came by the other party's "(i) acknowledgment of the Purchase Order; (ii) furnishing of any supplies under the Purchase Order; (iii) acceptance of any payment under the Purchase Order; or (iv) commencement of performance under the Purchase Order." Id. Most important, the document states that "[a]dditional or different terms or conditions proposed by the Seller shall be void and have no effect unless accepted in writing by Supply Core." Id. No changes to the Purchase Order were valid "unless in writing and signed by SupplyCore's authorized representative." Id. Further, the agreement required that "[a]ny controversy or claim arising out of or relating to the Purchase Order, or the breach of any provision thereof, shall be settled by binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules as then in effect[.]" Id. at ¶ 18. The arbitration was to be held in Rockford, Illinois. Id.

On December 17, 2014, CMA sent SupplyCore a series of "Order Acknowledgement[s] [sic]." see Exh. C to Affidavit of Brandon Lepke, dkt. # 14-4. The documents provided that, "[t]he above referenced PO has been received and is accepted as follows[.]" Id. CMA agreed to the quantity, price and due date referenced in the Purchase Order the acknowledgment referenced. Id. CMA also stated that "Payment Terms are Net 30 days from invoice date, FOB Origin." The acknowledgment stated that "CMA's Terms of Sale apply. Any Terms listed on the above referenced PO that contradict or that are in addition to CMA's Terms of Sale shall not apply to this order." Id.

9

### ii. Analysis

The evidence recited above makes clear that the question regarding arbitration must in this case turn on which side's Terms and Conditions apply to the case. If CMA's terms apply, then no arbitration provision is available to be invoked. If SupplyCore's terms apply, then arbitration is required.

The parties agree that Section 2-207 of the Uniform Commercial Code ("UCC") controls. "Under New York law, section 2-207 of the UCC governs the formation of contracts when the terms of the parties' writings are not identical." Stemcor USA, Inc. v. Trident Steel Corp., 471 F.Supp.2d 362, 366 (S.D.N.Y. 2006). That section provides that:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.
>
> (2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:
>
>     (a) the offer expressly limits acceptance to the terms of the offer;
>
>     (b) they materially alter it; or
>
>     (c) notification or objection of them has already been given or is given within a reasonable time after notice of them is received.
>
> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of chapters 1 through 9 of this title.

N.Y. UCC § 2-207. Under Section 2-207, "an expression of acceptance or written

confirmation that sets forth terms in addition to those initially agreed upon will not defeat formation of binding contract." Aceros Prefabricados, S.A. v. TradeArbed, Inc., 282 F.3d 92, 98 (2d Cir. 2002). Instead, a contract will be found and the additional terms . . . are then treated as 'proposals' for addition to the contract." Id.

The First Circuit Court of Appeals has summarized this section as follows:

> Section 2-207 thus affords three main avenues of contract formation. First, if the parties exchange forms with divergent terms, yet the seller's invoice does not state that its acceptance is made 'expressly conditional' on the buyer's assent to any additional or different terms in the invoice, a contract is formed, and its precise terms are determined through recourse to the three-part test in § 2-207(2). Second, if the seller does make its acceptance 'expressly conditional' on the buyer's assent to any additional or divergent terms in the seller's invoice, the invoice is merely a counteroffer, and a contract is formed only when the buyer expresses its affirmative acceptance to the seller's counteroffer. Unlike the 'mirror image' rule at common law, however, the seller's invoice is not deemed 'expressly conditional' under § 2-207 merely because its terms do not *match* the terms of the buyer's offer. Rather, to be deemed 'expressly conditional,' the seller's invoice must place the buyer on unambiguous notice that the invoice is a mere counteroffer. Finally, where for any reason the exchange of forms does not result in contract formation (e.g., the buyer 'expressly limits acceptance to the terms of [its offer' under § 2-207(2)(a), or the buyer does not accept the seller's counteroffer under the second clause of § 2-207(1)), a contract nonetheless is formed if their *subsequent conduct*–for instance, the seller ships and the buyer accepts the goods–demonstrates that the parties *believed* that a binding agreement had been formed. The terms of their agreement would then be determined under the 'default' test in § 2-207(3), which implicitly incorporates the criteria proscribed in § 2-207(2).

JOM, Inc. v. Adell Plastics, Inc., 193 F.3d 47, 53-54 (1st Cir. 1999) (emphasis original)(internal citations omitted).

Defendant argues that the offer in this case came when SupplyCore sent out the series of purchase orders beginning in November 2014. CMA's Order Acknowledgment, Defendant contends, did not make acceptance of the offer–and the inclusion of CMA's terms–"expressly conditional" on CMA's contract terms. As a result,

11

the inclusion of CMA's terms in the Acknowledgments operated only as "a proposal for addition to the contract" and are subject to the rules stated in Section 202-7(2). Bayway Ref. Co. v. Oxygenated Mktg. & Trading A.G., 215 F.3d 219, 223 (2d Cir. 2000). That section provides that any additional proposed terms become part of the contract unless "(a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter it; or (c) notification of objection of them has been given or is given within a reasonable time after notice of them is received." N.Y. U.C.C. Law § 2-207(2). Defendant argues that the purchase orders "incorporated by reference" SupplyCore's Terms, which expressly limited acceptance to the inclusion of those terms. As such, the additional terms proposed in CMA's Acknowledgment did not become part of the contract. SupplyCore's terms apply, and arbitration must be ordered.

Plaintiff responds to this argument in several ways. First, CMA contends that SupplyCore had already accepted CMA's Terms of Sale in 2009, when SupplyCore signed a credit application that required acceptance of CMA's terms. The application, Plaintiff argues, created a durable agreement that applied to the parties' subsequent transactions. In any case, CMA insists that the price quotes, discussed above, were the offer in the case, not SupplyCore's purchase orders. CMA contends that the price quotes provided sufficient detail as to unit description, quantity, price, time, manner of delivery and shipment, and the terms of sale to constitute offers under New York law. Because CMA's quotations were the offer, UCC § 2-207(2)(a) works to CMA's benefit. The Purchase Orders formed a contract, and CMA's Acknowledgment forms expressly conditioned acceptance on use of CMA's terms. SupplyCore's subsequent performance amounted to acceptance of the conditions, and CMA's terms apply.

12

The parties' arguments, and the relevant law explained above, make clear that this case turns on whether CMA's communications with Defendant from April until November 2014 were mere price quotations, or constituted offers which SupplyCore accepted with its purchase orders. Both parties expressly conditioned acceptance of the offers on the other side's accept of their terms, and the parties admit they subsequently performed on the contract. Neither party's briefing disputes this conclusion. Thus, under the terms of Section 2-207(2), the offeror's terms and conditions control.

The Court finds that Plaintiff was the offeror in this case. Defendant argues that Plaintiff's communications between April and November 2014 were mere "price quotations" and cannot qualify as offers. Courts have found that "'whether a price quote may be considered an offer in any given case is a question of fact dependent on the nature of the particular acts or conduct and the circumstances surrounding the transaction.'" Gerard Lollo & Sons, Inc. v. Stern, 168 A.D.2d 606, 606-607, 563 N.Y.S.2d 442, 442 (2d Dept. 1990) (quoting Maurice Elec. Supply Co. v. Anderson Safeway Guard Rail Corp., 632 F.Supp. 1082, 1087 (D.D.C. 1986)). The "factors relevant to a determination whether a price quote is an offer include (1) 'the extent of prior inquiry' . . . (2) 'the completeness of the terms of the suggested bargain' . . . and (3) the number of persons to whom the price is quoted." Enidine Inc. v. Dayton-Phoenix Group, Inc., No. 02-CV–230E(F), 2003 U.S. Dist. LEXIS 18483 at *12 n.13 (W.D.N.Y. Sep. 30, 2003) (citing Rich Prods. Corp. v. Kemutec, Inc., 66 F.Supp.2d 937, 956-58 (E.D. Wis. 1999); N.Y. U.C.C. §§ 2-206, 2-207, 2-208).

As described above, the particular facts and circumstances surrounding the

transactions in question, as well as their five-year course of dealings between the parties, indicates that Plaintiff's detailed description of the products to be produced, the prices for those products based on the quantity offered, the negotiations and exclusivity of the offer made to Defendant, and the specified time and terms of delivery, indicate that the prices quoted constituted an offer. Defendant's purchase orders accepted an offer, and cannot themselves be an offer.

Defendant's argument that its purchase orders constituted offers because Plaintiff's offer had closed is unpersuasive. Defendant is correct that "[t]he offeror . . . is 'master of his offer'" and is permitted to set the terms upon which acceptance can be had. Don King Productions, Inc. v. Douglas, 742 F.Supp. 786, 790 (S.D.N.Y. 1990). Defendant is also correct to state that the initial offer in this case clearly stated that the offer was open for sixty days. Equally clear, however, is the fact that the parties corresponded later about the offer, and that Plaintiff reiterated the offer on the same terms. The very day that Plaintiff reiterated the offer, Defendant sent a purchase order that reflected exactly the terms previously offered by the Plaintiff. This conduct, combined with the course of dealings between the parties, makes clear that the purchase orders were an acceptance of the offer that the Plaintiff made in April 2014, reiterated on November 3, 2014, and left open until March 31, 2015.

The Defendant's motion to stay will be denied as the Court has concluded that no agreement to arbitrate exists. Defendant's motion to dissolve the state-court temporary restraining order ("TRO") will also be denied. The basis for Defendant's motion is that dissolving the TRO would be necessary to permit Defendant to undertake the arbitration to occur. As the parties did not agree to arbitration, dissolving the TRO is

unnecessary.

### B. Motion to Transfer Venue

In the alternative, Defendant seeks to transfer venue to the United States District Court for the Northern District of Illinois. The basis for Defendant's motion is that the forum selection clause in SupplyCore's terms mandates that that Court be the forum for any disputes. As explained above, the Court finds that CMA's terms control. SupplyCore's forum selection clause does not apply, and the motion to transfer will be denied.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion and renewed motion to stay the case and dissolve the temporary restraining order or in the alternative to dismiss or transfer venue to the Northern District of Illinois, dkt. #s 14, 24, are hereby DENIED.

IT IS SO ORDERED.

Dated: March 29, 2016

Thomas J. McAvoy
Senior, U.S. District Judge