**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
**COMPREHENSIVE MANUFACTURING ASSOCIATES,**

                **Plaintiff,**

v.                                                             **3:15-CV-835**

**SUPPLYCORE, INC.,**

                **Defendant**.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
**THOMAS J. McAVOY**
**Senior United States District Judge**

## DECISION and ORDER

Before the Court is Plaintiff's motion to dismiss Defendant's counterclaims. See dkt. # 41. The parties have briefed the issues and the Court has determined to decide the matter without oral argument.

### I.    BACKGROUND

This matter concerns a contract dispute between two manufacturers. Plaintiff Comprehensive Manufacturing Associates ("CMA") brought a breach of contract action against Defendant SupplyCore, Inc. ("Supplycore"). CMA is a supplier and assembler of fabricated parts. See dkt. # 16, Amended Complaint, at ¶. SupplyCore, one of CMA's customers, specializes in Armed Forces logistics and supply chain management. Id. at ¶ 8. CMA alleges that SupplyCore breached the parties' contract in late 2014 by cancelling purchase orders. Id. at ¶ 33.

After being served with the complaint, SupplyCore brought a motion to dismiss.

1

The parties disagreed about the terms of their agreement. CMA argued that the parties formed a contract in late 2014, obligating SupplyCore to abide by CMA's contract terms. SupplyCore disagreed, contending that CMA was bound by SupplyCore's terms, which included an agreement to arbitrate. The Court concluded that CMA's contract terms controlled the present dispute. See Decision and Order, dkt. # 35.

Plaintiff then filed an Amended Complaint, which seeks $129,315.42 in damages from the cancelled contracts, as well as interest, attorney's fees, witness fees and court costs. See Amended Complaint, dkt. # 16. Defendant answered and raised three counterclaims: 1) unjust enrichment, 2) recoupment, 3) breach of the implied duty of good faith and fair dealing. See Answer to Amended Complaint, dkt. # 37 at pp. 12-13. Plaintiff now moves to dismiss Defendant's counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). See SupplyCore's Motion to Dismiss, dkt. # 41.

## II. LEGAL STANDARD

CMA has filed a motion to dismiss SupplyCore's counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6). In addressing such motions, the Court must accept "all factual allegations in the [Defendant's counterclaims] as true, and draw all reasonable inferences in the [Defendant's] favor." Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009). This tenet does not apply to legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. "To survive a motion to dismiss, a [counterclaim] must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (quoting Bell Atl. v. Twombly, 550 U.S. 544, 570 (2007)).

The Court considers the parties' contract and related purchase agreements as incorporated into the complaint. See SupplyCore's Motion to Dismiss, dkt. # 41, pp. 1-66. A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." See Int'l Audiotext Networks, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995). Further, in cases where the complaint is "replete with references to the contracts" and where the parties request "judicial interpretation of [contract's] terms," courts look to relevant documents outside the face of the complaint. See Chambers v. Time Warner, Inc., 282 F.3d 147, n. 4 (2d Cir. 2002).

## III. ANALYSIS

Plaintiff CMA moves to dismiss Defendant Supplycore's counterclaims. The Court will address the issues as appropriate.

### A. Breach of Implied Duty of Good Faith and Fair Dealing

#### i. Factual Background

This dispute arose when Defendant SupplyCore cancelled four purchase orders with Plaintiff CMA. SupplyCore originally contracted with CMA to obtain manufactured parts. See SupplyCore's Counterclaims, dkt. # 37, at ¶ 1. SupplyCore planned to use the manufactured parts to fulfill a separate contract with the Defense Logistics Agency ("DLA"), the largest logistic combat support agency within the Department of Defense. Id. at ¶ 2. The DLA was not privy to the contract between SupplyCore and CMA. SupplyCore alleges that during negotiations, and when CMA accepted the purchase orders in question, "CMA understood that SupplyCore was placing orders in

3

connection" with a contract with a federal agency. Id. at ¶ 4. SupplyCore alleges further that "CMA understood that the federal government could impose certain inspection requirements on the manufacturers of its parts, and that . . . it would be required to submit to . . . inspections." Id. at ¶ 5. SupplyCore alleges that CMA knew that "SupplyCore believed CMA intended to fulfill all of the obligations attendant to manufacturing parts in connection with the federal government, including inspection by [the] DLA." Id. at ¶ 6.

SupplyCore further alleges that "CMA led SupplyCore to believe that it would permit federal government agencies to inspect its . . . facility." Id. at ¶ 10. SupplyCore made "advance payments" to CMA totaling $91,984.40. Id. at ¶ 11. After accepting advance payment, CMA refused to allow the Defense Contract Management Agency ("DCMA") (the inspection department of the DLA) to inspect its facility, citing "business supply chain information" and "intellectual property" concerns. Id. at ¶ 14. As a result of CMA's refusal, SupplyCore issued a stop-work order to CMA on March 4, 2015. Id. at ¶ 15. A month later, SupplyCore sent a termination notice to CMA, citing CMA's refusal to allow the DCMA inspection "despite leading SupplyCore to believe that it would [submit to inspection]." Id. at ¶ 18. CMA retained the $91,984.40 in advance payments.

CMA points to several clauses in the parties' contract that justify its retaining SupplyCore's advance payments. In relevant part, the agreement provides that, "[n]o inspections shall be conducted at CMA or at their vendors." See Amended Complaint, dkt. # 16, at ¶ 31. CMA interprets this clause to mean "no inspections means no inspections," even by the federal government. "On its face, the 'INSPECTIONS &

4

ACCEPTANCE' clearly prohibits all inspections at CMA's premises, whether by SupplyCore, the U.S. Government or anyone else. 'No inspections' means just that." See CMA Memorandum of Law ("CMA's Brief"), dkt. # 48, at 9. SupplyCore contends that CMA breached the contract when they refused the DLA inspection. CMA replies that SupplyCore is subject to CMA's cancellation policy, and that the contract provides CMA with the right to refuse inspection. The cancellation policy provides that:

> CMA provides parts and assemblies that are manufactured to their customer's specifications and are thus considered Non-Cancelable Non-Returnable. In the event of a cancellation of any order by seller for default of purchaser, purchaser shall be liable for reasonable cancellation costs, including but not limited to . . . Raw Materials, Non-Cancelable Non-Returnable materials, Tooling and Set-Up Charges, but said cancellation costs shall be not less than 25% of the total Purchase Order value . . . In the event of cancellation of any order by purchaser for non-default of seller, purchaser shall be liable for reasonable cancellation costs, including but not limited to . . . Raw Materials, Non-Cancelable Non-Returnable materials, Tooling and Set-Up Charges, but said cancellation costs shall be not less than 25% of the total Purchase Order value.

CMA's Memorandum of Law in Reply to SupplyCore's Opposition, dkt. # 48, at 3. By virtue of this policy, CMA seeks $129,315.42 in damages

### ii. Analysis

SupplyCore's first counterclaim alleges that CMA breached the implied duty of good faith and fair dealing by refusing to allow the DCMA to inspect its manufacturing facility. SupplyCore alleges that "CMA breached this obligation when it unreasonably refused to allow the DCMA, which was not a party to its agreement with SupplyCore, to inspect its manufacturing facility, even though CMA's unreasonable refusal in this regard frustrated SupplyCore's rights to the benefits of the agreement." See SupplyCore's Answer, dkt. # 37 at ¶ 31. SupplyCore argues that the inspections and

acceptance provision of the contract only applies to purchasers, and does not cover third parties – in this case the DCMA. SupplyCore points to the lack of language in the contract referencing third parties as evidence for the claim that the contract does not bind the DCMA. Further, in its counterclaim, SupplyCore points to alleged "understandings" between the parties and alleges that CMA led SupplyCore to believe that CMA would allow inspections. Id. at ¶ 10. CMA responds by construing the term "no inspections" generally, and points to the plain language and the lack of reference to third parties as evidence of a straightforward categorical prohibition of on-site inspections. Further, CMA invokes the parol evidence rule to block the admission of evidence suggesting that there were any alleged "understandings" between the parties with respect to third-party inspections.

The present dispute raises two discrete but interrelated questions based primarily on the interplay between the parol evidence rule and interpretation of the contract's integration clause. First, the Court must determine whether the contract in this case is ambiguous with respect to third-party inspections. If not ambiguous, the Court must determine whether the contract prohibits third-party inspections, or whether by its silence it does not alter the obligations of third-parties with respect to the agreement between SupplyCore and CMA. Second, if the contract does not reference the prospect of third-party inspections, the Court must determine the extent to which the contract's integration clause bears on SupplyCore's ability to bring in extrinsic evidence of the "understandings." Finally, the Court must determine the extent to which the alleged "understandings," as pled by SupplyCore, implicate its ability to survive CMA's motion to dismiss.

Under New York Law, which controls the present dispute, "if a contract is unambiguous on its face, the parties' rights under such a contract should be determined solely by the terms expressed in the instrument itself." See Travel Co., Ltd. v. Pan American World Airways, Inc., 944 F.2d 983, 987-88 (2d Cir. 1991). This "parol evidence rule" generally bars interpretation of the contract using "extrinsic evidence as to terms that were not expressed or judicial views as to what might be preferable." Id. at 988 (citing Metropolitan Life Ins. Co., v. RJR Nabisco, Inc., 906 F.2d 884, 889 (2d Cir. 1990); see also W.W.W. Associates, Inc. v. Giancontieri, 77 N.Y.2d 157, 163 (1990) ("[i]t is well settled that extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face."). Although parol evidence cannot be admitted to create an ambiguity, a party may use parol evidence to explain the meaning of an ambiguous provision. See Investors Ins. Co. of America v. Dorinco Reinsurance Co., 917 F.2d 100, 104 (2d Cir. 1990). "Whether a contract's terms are ambiguous is a question of law decided by the court." See Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993). "An ambiguous term is one about which reasonable minds could differ." Id.

In cases where the contract is not ambiguous but the writing omits important contract provisions, courts consider extrinsic evidence to determine the intent of the parties even if the contract contains an integration clause. See Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447, 451 (2d Cir. 1977) ("[c]ertain oral collateral agreements, even though made contemporaneously, are not within the prohibition of the parol evidence rule."). "[T]he overarching question is whether, in the context of the particular setting, the oral agreement was one which the parties would ordinarily be

7

expected to embody in the writing." Id. Further, "in more complex situations, in which customary business practice may be more varied, an oral agreement can be treated as separate and independent of the written agreement even though the written contract contains a strong integration clause." Id. at 451-52. "As is sometimes the case, a detailed and ratified contract—even one that attempts to provide for innumerable contingencies, to anticipate disputes and to preempt litigation—may yet be silent as to a question that later becomes critical. Reliance upon extrinsic evidence then becomes perfectly appropriate." See Bank of New York Trust Co., N.A. v. Franklin Advisers, Inc., 726 F.3d 269, 281 (2d Cir. 2013) (citing British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2003) (applying New York law).

In this case, the parties dispute the scope and meaning of the contract's inspections and acceptances provision. The provision provides that:

> No inspections shall be conducted at CMA or at their vendors. The purchaser shall inspect and accept any products delivered immediately after purchaser receives and/or takes custody of such products. In the event the products do not meet the drawings, designs, and/or specifications, the purchaser shall notify CMA of such noncompliance in writing and give CMA a reasonable opportunity to correct any such noncompliance. If the purchaser does not allow CMA reasonable opportunity to correct noncompliances, the purchaser assumes all responsibility for the product including the original purchase price and additional costs incurred by purchaser to correct the noncompliances. The purchaser shall be deemed to have accepted any products delivered and to have waived any such noncompliance in the event a written notification that the products delivered do not comply with the drawings, design, and/or specifications, is not received by CMA within 10 business days after the purchaser takes Title of the products delivered.

See Contract as Attached to CMA's Motion to Dismiss, dkt. # 41, Exhibit C. SupplyCore contends that the provision does not speak to, and thus does not apply to,

third-party government inspections. In the alternative, SupplyCore contends that the provision is at least ambiguous. The Court agrees at the very least that this provision is ambiguous and may be interpreted by external evidence. While CMA is correct that "no inspections" means "no inspections," this principle is limited by the plain text of the contract only to purchasers with whom CMA has contracted, as indicated by the provision's repeated reference to "purchasers." Further, it is not clear from the provision—as is argued by CMA—that the "inspections" in question refer to on-site inspections of CMA's facilities. Rather, a natural reading of term "inspections" in this context suggests that this provision applies to inspections of the purchased final product, not CMA's facilities. As such, the alleged "understandings" between the two parties are admissible to determine the full scope of the parties' obligations with respect to third-party inspections. To the extent that CMA argues that the parol evidence rule blocks these "understandings" from consideration, CMA's argument is without merit.

SupplyCore alleges certain "understandings" between the parties as part of the contract negotiation. For purposes of this motion, the Court assumes the truth of those allegations. First, SupplyCore alleges "CMA knew that SupplyCore believed CMA intended to fulfill all of the requirements attendant to manufacturing parts in connection with the [DLA contract], including submitting to inspections by DLA from time to time." See SupplyCore's Counterclaims, dkt. # 37 at ¶ 6. Second, "at the time CMA accepted SupplyCore's orders, it did not intend to perform its obligations as a subcontractor on a [DLA contract], but did not inform SupplyCore of this fact." Id. at ¶ 9. Third, "CMA led SupplyCore to believe that it would permit federal government agencies to inspect its manufacturing facility." Id. at ¶ 10. Fourth, "CMA accepted . . . SupplyCore's advance

9

payment with the knowledge that the orders related to the [DLA contract] which could require CMA to permit the federal government to inspect its manufacturing operations." Id. at ¶ 12.  Lastly, SupplyCore alleges that "CMA breached [the obligation of good faith] when it unreasonably refused to allow DCMA . . . to inspect its manufacturing facility."  Id. at ¶ 31.

Every commercial contract in New York contains an implied covenant of good faith and fair dealing.  "New York law implies such a covenant in all contracts."  Security Plans, Inc. v. CUNA Mut. Ins. Soc., 769 F.3d 807 (2d Cir. 2014) (citing 511 W.232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153, 746 N.Y.S.2d 131, 773 N.E.2d 496, 500 (2002)).  Pursuant to this principle, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  Moran v. Erk, 11 N.Y.3d 452, 456, 872 N.Y.S.2d 696, 901 N.E.2d 187, 190 (2008).

The Court has found that these allegations with respect to the pre-breach representations and understandings are not barred by the parol evidence rule for the purposes of this motion.  The alleged understandings are admissible at this stage to more clearly define the inspections provision.  SupplyCore has alleged that CMA refused on-site inspection by the DMCA, which destroyed "the right of the [SupplyCore] to receive the fruits of the contract."  Moran, 11 N.Y.3d at 456.  SupplyCore has also alleged that CMA led SupplyCore to believe that CMA would allow inspections.  Assuming the truth of these alleged understandings and representations, the Court finds that SupplyCore has stated sufficient factual matter to survive a motion to dismiss.  The Court will deny CMA's motion to dismiss in this respect.

### B. Unjust Enrichment and CMA's Liquidated Damages Clause

SupplyCore's second counterclaim alleges unjust enrichment by virtue of CMA retaining SupplyCore's advance payments. SupplyCore alleges that "SupplyCore conferred a benefit upon CMA by making advance payments . . . to CMA," and that "CMA . . . accepted, and retained the benefit of the advance payments, despite the fact that it did not provide to SupplyCore any of the goods ordered." See dkt. #37 at ¶ 21. CMA responds by arguing that CMA has retained the advance payments because SupplyCore breached the parties' contract, and is subject to the contract's cancellation policy. See Motion to Dismiss, dkt. # 41-2 at 13. SupplyCore counters that CMA's cancellation policy is unenforceable under New York law because the contract allows CMA to "have its cake and eat it too." See Memorandum of Law, dkt. # 46 at 7-8. SupplyCore contends that the contract impermissibly allows CMA to choose between liquidated damages at 25% of total purchase price or actual damages. The cancellation policy provides that:

> CMA provides parts and assemblies that are manufactured to their customer's specifications and are thus considered Non-Cancelable Non-Returnable. In the event of a cancellation of any order by seller for default of purchaser, purchaser shall be liable for reasonable cancellation costs, including but not limited to Finished Goods, Work In Process, Raw Materials, Non-Cancelable Non-Returnable materials, Tooling and Set-Up Charges, but said cancellation costs shall be not less than 25% of the total Purchase Order value. <u>In the event of cancellation of any order by purchaser for non-default of seller, purchaser shall be liable for reasonable cancellation costs, including but not limited to Finished Goods, Work in Process, Raw Materials, Non-Cancelable Non-Returnable materials, Tooling and Set-Up Charges, but said cancellation costs shall be not less than 25% of the total Purchase Order value</u>. In the event of a cancellation of any order by purchaser for default of seller, purchaser shall not be held liable for any cancellation costs and seller shall not accept any penalties from purchaser.

11

Contract as Attached to CMA's Motion to Dismiss, dkt. # 41, Exhibit C. (Emphasis added).

To recover under an unjust enrichment theory, three elements must be met. First, the defendant must be enriched. Second, the defendant must be enriched at plaintiff's expense. Third, equity and good conscience must militate against permitting defendant to retain what plaintiff seeks to recover. Briarpatch Ltd. V. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004). SupplyCore argues that CMA has retained advance payments and been unjustly enriched through an illegal liquidated damages clause. This unjust enrichment claim depends on whether the liquidated damages clause is enforceable under New York law.

"It is commonplace for contracting parties to determine in advance the amount of compensation due in case of a breach of contract. See United Air Lines, Inc. v. Austin Travel Corp., 867 F.2d 737, 740 (2d Cir. 1989). Further, a "liquidated damages clause generally will be upheld by a court, unless the liquidated amount is a penalty because it is plainly or grossly disproportionate to the probable loss anticipated when the contract was executed." Id. "Liquidated damages are not penalties if they bear a 'reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation." Id. (citing Leasing Service Corp v. Justice, 673 F.2d 70, 73 (2d Cir. 1982). "Whether the sum stipulated represents a liquidation of the anticipated damages or a penalty is a question of law, with due consideration for the nature of the contract and the attendant circumstances." U.S. Fidelity and Guar. Co. v. Braspetro Oil Services Co., 369 F.3d 34, 71 (2d Cir. 2004) (citing J.R. Stevenson Corp. v. County of

12

Westchester, 113 A.D. 2d 918, 920-21, 493 N.Y.S. 2d 819 (2d Dep't 1985). The party attempting to avoid enforcement has the burden of showing that a liquidated damages clause is a penalty. See JMD Holding Corp. v. Congress Financial Corp., 4 N.Y.3d 373, 380, 828 N.E.2d 604, 795 N.Y.S.2d 502 (2005). Lastly, "when evaluating a liquidated damages provision, a court must also give due consideration to 'whether the parties were sophisticated . . . represented by counsel . . . [and whether] the contract was negotiated at arms-length.'" L & L Wings, Inc. v. Marco-Destin Inc., 756 F.Supp.2d 359 (S.D.N.Y. 2010); AXA Inv. Manages UK Ltd. v. Endeavor Capital Management LLC, 890 F.Supp.2d 373 (S.D.N.Y. 2012).

In this case, CMA's cancellation policy gives CMA a choice between accepting actual damages or 25% of the contract price. SupplyCore alleges that this choice is unenforceable under New York law. The Court agrees. The question here is not whether the 25% floor is a reasonable prediction of damages—it very well might be—but rather whether the choice afforded to CMA to choose between liquidated or actual damages is too indefinite to satisfy the basic purpose of liquidated damages. Liquidated damages fix the damages owed in the event of a breach. Courts generally uphold liquidated damages negotiated between sophisticated parties who choose to contract away future disputes over damages. Here, CMA's liquidated damages clause provides CMA a choice between collecting fixed damages (25% of total purchase order) or pursuing litigation to determine damages. A liquidated damages clause is designed to dispense with such actions. The clause here allows CMA to pursue actual damages if 25% of the contract price is insufficient. The Court agrees with SupplyCore. The existence of such a choice and CMA's ability to "have its cake and eat it" defeats the

13

purpose of a liquidated damages clause, and as such, is unenforceable under New York law.

Jarro Bldg. Industries Corp. v. Schwartz, 54 Misc.2d 13, 18, 281 N.Y.S.2d 420 (N.Y. App. Term 1967) expresses this principle. There, the court found that "the underlying purpose [of a liquidated damages clause] is to permit parties to look to the future, anticipate that there may be a breach and make a settlement in advance. This implies two things; (1) that the amount specified be a fixed amount and (2) that both parties be bound to that amount." Id. In Jarro Bldg, the clause in question stated that "[plaintiff can] collect 30% of the total consideration herein named as liquidated damages for the breach of said contract, or sue at law for such damages." Id. The court found that the existence of such a choice defeated the purpose of liquidated damages.

Stock Shop, Inc. v. Bozell and Jacobs, Inc., 126 Misc.2d 95, 481 N.Y.S. 2d 269 (N.Y. App. Div. 1984), applied a similar principle in refusing to enforce a liquidated damages clause. The clause in Stock Shop operated similarly to the clause in question in the present matter, setting a $1,500 minimum in liquidated damages in the event of damage to plaintiff's property. The court in Stock Shop, citing Jarro, found that the $1,500 minimum provided the plaintiff with the same sort of impermissible choice between a fixed damages number or actual damages. Id.; see also Dalston Const. Corp v. Wallace, 26 Misc.2d 698, 214 N.Y.S.2d 191, 193 (Supreme. Ct. Nassau Cty. 1960) (finding a minimum damages percentage to be unenforceable). The Southern District of New York has also applied the same principle in finding unenforceable a "choice" liquidated damages clause. See Hulko v. Connell, No., 83-cv-7760, 1988 WL

75012, at *2 (S.D.N.Y. July 14, 1988) (citing Jarro, and Dalston Const.) Hulko provided that:

> It is generally held that liquidated damages provisions giving the beneficiary the option of retaining the liquidated amount and also claiming damages at large is invalid and unenforceable, lest the beneficiary be permitted "to have his cake and eat it too." To avoid that unacceptable result, in order for a liquidated damage provision to be valid both parties must be bound to the liquidated amount.

Id.; see also CIT Group/Commercial Services, Inc. v. Holladay-Tyler Printing Corp., No. 94-cv-6642, 1995 WL 702343, at *3 (S.D.N.Y. Nov. 29, 1995) (applying the same principle).

CMA's motion is denied with respect to this claim. The Court finds CMA's cancellation policy unenforceable under New York law. Therefore, assuming the truth of SupplyCore's allegations, and making reasonable inferences in SupplyCore's favor, Supplycore has stated a claim for unjust enrichment and motion will be denied in this respect.

**C.    Recoupment**

SupplyCore's last counterclaim alleges a right of recoupment for the $91,984.40 worth of advance payments that CMA retained after SupplyCore cancelled purchase orders. CMA responds by arguing that SupplyCore does not have any "actionable claims" against CMA, and as such, are prohibited from asserting any right of recoupment. However, SupplyCore has sufficiently pled two actionable claims against CMA. Therefore, CMA's motion to dismiss SupplyCore's recoupment will be denied.

**IV.    CONCLUSION**

For the reasons stated above, CMA's motion to dismiss SupplyCore's counterclaims, dkt. # 41, is hereby DENIED.

Dated:August 23, 2016

Thomas J. McAvoy
Senior, U.S. District Judge